Good morning. May it please the Court, I'm going to save seven minutes for rebuttal. There are three bases on which the jury verdict here should be overturned. They are brief, and I'd like to touch on some of the high points. First, is plaintiff offered absolutely no concrete evidence to quantify an appropriate amount of damages for injury to his reputation or creditworthiness under the FCRA. Simply put, the $250,000 jury verdict was snatched out of thin air. The only indication of that number as a damage number came up in closing argument. It is completely unsupported by any evidence. Secondly, the jury's assessment of a $30,000 civil penalty under California's Identity Theft Law was wrong both as a matter of fact, in that there was absolutely no evidentiary support for that number, again, snatched out of thin air, and additionally is contrary to law but rather up to, requires that a claim be pursued after notice of an identity theft claim. Pursued is quite clearly stated in the statute as a matter of statutory construction and is defined to mean actual active attempts to collect the debt, of which there is zero evidence in the record, and in fact, this point was not even advanced by plaintiff at trial. Plaintiff at no time argued that BMW engaged in collection activities. And third, is the district court failed to properly instruct the jury with respect to the FCRA claim, and specifically, the jury was not instructed pursuant to the language of this court in the Gorman case in which the court clarified the reasonableness standard under the FCRA to make absolutely clear that just because the conclusion reached during the credit reporting investigation turns out to be inaccurate, that does not mean necessarily that the investigation was unreasonable. With respect to this last point, the error in failing to instruct the jury was material and the evidentiary record, there is no record that the jury would have reached the same result had it been instructed. And I'll talk about this a bit. But on this last point, that is a basis for reversing and remanding the FCRA award in its entirety. I'm going to start from the back first, which is... When Mr. Kim, he is a licensed practitioner of Chinese medicine. And he has, I think, several degrees. And his friend, or someone that helped him get over here, took advantage of him. But he did call, he did call BMW. And BMW just blew him off. And he kept trying. And he was a man who had, as far as we know, certainly some evidence in the record, that he was a person who had a very, you know, good reputation. And so, the way I read this is, he calls them up. They really make no effort to look into this. Look at the documents. Have them examined. They just figured that maybe he was all tied in with this. And so you say that $250,000 for damage to his reputation. Well, sure, the lawyers suggested a number of lawyers do that all the time. You've got a jury there. They see what's going on. They can understand. And so I don't see where you can fault the jury for awarding him $250,000. That's not much money these days. Maybe you can buy a garage door someplace. You can buy multiple BMWs, Your Honor. What? You can buy multiple BMWs. For $250,000? Yes. Your Honor, you have many. Is your question complete? I don't want to interrupt you. What did you say? My question is whether your question was complete, because I did not want to interrupt. No, I mean, I don't see the jury on the $250,000. He's there. His lawyer makes an argument. The jury gets a pretty good idea of what he's gone through. They agree with the lawyer. I mean, I've seen that happen many times, where the lawyer will come up with a number, and the jury will accept that number. So I think you got off easy, myself. The way people are treated and consumers are treated today, there's going to be a lot more of these. Have you ever tried calling one of these companies, trying to get a hold of someone to talk to when you've got a legitimate claim? Try it sometime. You've spent half your life, and you'll end up talking to someone that is 10,000 miles away. So that's my take on it. Well, Your Honor, if I might respond, there are many questions embedded in your questions. So if I might respond to them. So respond to the first question is, why didn't sufficient evidence support the $250 award for loss of reputation? He was denied credit three times, right? You don't dispute that? Well, there is no evidence that he was denied credit three times. The only evidence of any denial of credit was Mr. Kim, the plaintiff. There are two Mr. Kims involved here. We understand that. Mr. Kim, the plaintiff, testifying he was denied credit, but he didn't have a time frame and couldn't say by whom he was denied credit. And there was no paper record of that whatsoever. And the critical point here is that the dispute was not submitted until September of 2013. He said he was denied credit sometime in 2013. But the jury could have inferred it happened after, because he had never been denied credit before. So, again, we have to assume all the facts and look at the evidence, judge this on a substantial evidence basis, and draw all the inferences in favor of the prevailing parties. You can assume that the jury could have found and did find that he was denied credit because of and after the events here, because he was then not denied credit after May of 2014. So what else would need to be put into the record in order to sustain any kind of a dollar amount? Any evidence with respect to his reputation, of which there was no evidence put in with respect to his reputation. What's an example of what would be sufficient? I mean, there are a number of cases that talk about reputational risk. For example, as known in the community, there was one case which we cited in which a judgment against somebody became known publicly, and it was based on an identity theft case. And one of the store merchants with whom this person dealt started calling the plaintiff, my favorite felon. That is a reputational issue. Well, his reputation here, because the credit report was obviously looked at, if you believe his testimony, three times by some creditor, and so his reputation was top of the list. There's no evidence beside him saying, yes, it was looked at three times by someone that he could not identify, and with no paper record. In the credit reporting process, there are paper records that reflect when credit reports are looked at. All right, well, you want to impeach his testimony, you want to question the veracity of his testimony, but that's not what we're here for. We have to assume that the jury believed his testimony. So the question is, given that fact, is that enough to support a finding of reputation damage? He knew that three creditors denied him credit after viewing this incident in this derogatory trade line by BMW. Our position is that's not enough to support it, but equally importantly, it's not substantial evidence with respect to the amount of damage. $250,000 is, in fact, a lot of money, and that is a very significant damage award when there is a lack of any evidence of monetary or economic harm. There was zero evidence put in of economic harm. To the extent there were, there was evidence with respect to emotional distress, and that was put in and the jury found that there was emotional distress in the amount of approximately $150,000 on the identity theft claim. It's not framed that way in the verdict, but if you read the jury instructions, it's quite clear that the jury was relying on the emotional distress claim to award those kinds of damages under the CITL claim. But here, as compared to the emotional distress claim, which is something different as to which we don't think that the evidence should have been, you know, the jury should have reached the conclusion it did, but there was evidence on an emotional distress claim. The jury considered that, awarded damages. We are not challenging the $150,000 award here. We are only challenging the $30,000 statutory penalty award on that particular claim. But with respect to reputational damage, there was zero evidence, other than these statements by Mr. Kim, uncorroborated by any other evidence. Why does there have to be corroboration? It was testimony. You got to put on your side, you put on your expert. He testified to the three denials of credit during this time period while the derogatory line was on his credit report, and that once BMW removed it, which was after he filed this lawsuit, that his credit wasn't denied anymore. But it doesn't translate to $250,000. There was no showing of economic harm or an economic connection between the, even if you accept his testimony as true, as uncorroborated as it is, notwithstanding that the credit report. He doesn't have a burden of corroboration. You got to cross-examine him, right? We did have the opportunity to cross-examine him, in which time he said that he had no paper documentation supporting that. It wasn't an immigration case where the judge requires corroboration. I mean, the jury obviously found him credible. And we're not challenging that finding. We're challenging the dollar number associated with that finding. I understand. You wanted to save seven minutes, and you're down to, like, 1.43. Do you want that time for rebuttal? I will save my time for rebuttal. Okay, thank you. Can I just get my glass of water before I begin? Oh, sure. May it please the Court, thank you very much for taking the time to read the briefs and consider the issues in this case. Here we have a gentleman. What do you think we do? Thank you for leading me to believe that you read the briefs and consider the case. And here we have a doctor, and he's got a blemish-free credit report. And his credit was so good that not only did his credit, before the BMW derogatory showed up on his credit, not only did his credit support his own credit ventures, but also two additional cars, one from Kia Finance and the BMW, from the identity thief Mike Kim, and also from Time Warner Cable, and also from Wells Fargo. In short, this guy's credit was so good that he was not only carrying his own load up the hill, he was carrying Mike Kim up the hill as well, credit-wise. And then suddenly because of the BMW financial derogatory, the repossession derogatory, suddenly he can't get credit at all. That is more than enough evidence right there of a $250,000 award for damage to reputation. Frankly, I think it's evidence for substantially more than $250,000. How do you calculate the $250,000? I want to get in. I'll tell you. Can I answer that in two parts? Of course. Just answer it. Okay. Number one is there's no obligation to calculate. Even the cases cited by BMW Financial say that you don't have to do a calculation. And I want to talk about their leading case, their home-run case. It's called Boris v. Choice Point. Boris v. Choice Point basically says it's the only case in all of American jurisprudence that says that there is a requirement of extrinsic evidence independent of the plaintiff's own testimony to show damages to reputation. But if you look at page 261 no, I'm sorry, 861 of the Boris decision, we have the judge in Boris saying, quote, however damage to credit or business reputation must rest on some extrinsic evidence, not just upon plaintiff's opinion. There is no citation to the Fair Credit Reporting Act for that statement. There is no citation to any circuit court case or district court case for that statement. In fact, Judge O'Connell got it right in her ruling on the motion for new trial and the motion for judgment as a matter of law, where she said that there was no requirement to show credit denials or specific dollar amounts to support the damages award for damages to reputation. And that's on pages 9 and 10 of Judge O'Connell's decision. And if the court is interested, I could read it. Judge O'Connell not only looked at the credit denials that Mr. Kim had suffered, also looked at something very important which Ms. Strickland has overlooked, and that is Mr. Kim testified that after he got those credit denials, he stopped applying for credit. He got the message. He got the message that he had been completely sidelined by BMW's financial derogatory. Here was a man who had enough credit to carry both himself and Mike Kim up the credit hill, not only with his own credit but also with his credit derogatories, and suddenly he can't get any credit at all. Is there anything in the record about what was the nature of the credit that was being denied, the magnitude, the nature? How did it impact him? What was it? I know one was a car loan. It was Audi. I could go back. Well, you know that, but, I mean, is there anything in the record, trial record in this case? There was only his testimony, Your Honor. He didn't testify as to what it was. It was a car loan, a house loan, a business loan. I know the Audi was a car loan. I know that. I don't know, and I do not, I think the other two, I don't have them memorized at the top of my head. I apologize. I think that the Audi was a car loan. I do not know the other two. But he was a man who had never been denied credit before. You know, and as a matter of fact. Might that affect the magnitude of the damage to reputation and creditworthiness if we knew something, or if the jury knew something about it was a loan for a house, you know, or maybe it was just a loan for something, a small piece of equipment or something? I believe that the jury is entitled to assume that the Audi financial or the Audi application should have had to do with a car. Evidence of an Audi application? Yeah, and that's a reasonable inference. I mean, it's, you know, you don't apply to Audi for a home loan or for a small equipment loan. But the Audi application is in the record as one of the loans that was denied? Yeah, that was his testimony. That was his testimony. And since this is important to you, I mean, I could try to find the other two. I remember that Audi was one of them, and let me see. Hold on. He was denied credit by Bank of America, Toyota, and Audi. So those are the three credit denials, and I'm looking at page 17 of the answering brief. Again, I'll be honest with you, Your Honor. I tried the case. I do not recall a specific testimony about specifically what he was applying for. But using the words Toyota and Audi, I presume the two of them were car loans. Bear in mind, before he had this derogatory on his credit report, he was carrying three car loans on his credit, two false loans from Mr. Kim and then his own car. So, you know, three cars, I mean, it's rough math, but three cars, at least one of which is a BMW, certainly adds up into the six figures, and probably more, plus the additional credit that he's carrying. After that, he can't get any credit at all. We not only have that, but we also have the testimony of Mr. Tartar. Mr. Tartar said that the derogatory is a very, very serious derogatory and would effectively sideline him from the case completely. Now, Judge O'Connell, Judge O'Connell's decision, frankly, is the correct analysis of this decision. He, Judge O'Connell, took a look at Mr. Tartar's testimony and the power of Mr. Tartar's testimony about how the derogatory, the repossession derogatory was one of the most serious derogatories that you can possibly put onto someone's credit. He's got the repossession derogatory and suddenly he's completely sidelined from credit. Judge O'Connell said in her order on the new trial motion, the motion for judgment of matter of law, that that alone was sufficient evidence to support the jury's findings of the $250,000. I'm going to have to agree with Judge Pregerson. This is not a situation where they awarded him a billion dollars or something like that. I mean, obviously, the discussion here this morning would be quite different if the jury had come back and given him a billion dollars. Frankly, I think that the evidence was probably sufficient to suggest a million dollars. When you take a man who is going through his life, his credit is perfect, he has never been denied any credit whatsoever, and suddenly he can't get any credit at all, to a point where he stops applying for credit altogether because he knows that it is fruitless and just an exercise in frustration, when you get to that particular point, when this man has never been denied credit, has carried three cars and additional accounts, his own accounts plus identity theft accounts, on his credit, I think a jury can – I think it is a reasonable inference that the value of that is $250,000 and probably a lot more. And taking a man whose credit was basically an invitation to the world to get anything he wanted, and suddenly completely taking that away from him, completely, I think $250,000 not only is a reasonable number, I think it is a modest number under the facts of this particular case. But we know that the denial of credit stopped after May of 2014. Correct, Your Honor. So this was at most a seven-month period of being under the mark of a negative trade line. More than that, about ten months, nine months. I don't think – let me tell you why I don't think the time period is important. The reason that the BMW Financial repossession derogatory was stopped reporting wasn't because of BMW Financial. It was because of Experian. Experian, when the lawsuit was filed, after the lawsuit was filed, took a look at the case a little bit more carefully and said, we better block this particular reporting. BMW Financial never did. They reported continuously. Had it not been for Experian's actions, I think that the jury was reasonable in concluding that the reporting would have continued probably until the day of the verdict and probably thereafter. BMW continued to – it's my understanding of the record that BMW stopped reporting it after they got sued. No. They continued reporting it? No. Experian blocked the report. The only evidence in the record – now, bear in mind, there's a distinction here. We have trial counsel for BMW Financial who's not sitting at the table over there, but she would say things which were not supported by the evidence. The only evidence in the record was that Experian blocked the reporting in May of 2014. There is no evidence in the record ever, no place, that BMW ever stopped the reporting. The inference is clear, and this also goes to the identity theft claim, the civil penalty, that BMW was treating Shante Kim, my client, the plaintiff, as a criminal, as participating in a straw purchase, and they were going to continue reporting him with the repossession until some other instrument, some other instrumentality stepped in and stopped it. In this case, it was Experian. What about the other two credit agencies? Is it the case that if one removes the line, the other two will too? Not necessarily. So were they reporting him during that time? I remember that we – and, again, I'm going from memory at this point. I don't know that this is a part of the record. I believe that TransUnion – I know, that's always dangerous. But I believe TransUnion was also – TransUnion and Equifax, I believe, were also reporting, but then they blocked it, and all three credit bureaus settled out before time of trial. That's my recollection. So the case was only against BMW Financial at the point of trial. And, again, I don't know that that's a part of the record, but that's my best recollection of what happened here. So, basically, I want to address the additional points. Can you address the pursue argument that was raised under the identity theft, that there was no, quote, and therefore no basis for the $30,000? From the very first time that Shantae Kim disputed this repossession with BMW Financial, they said he was a criminal. They said he participated in a straw purchase. They refused to stop the reporting. Then we brought the lawsuit against BMW Financial and the bureaus. During the pendency of the lawsuit, they did not take any affirmative collection action, but they continued to report until it was blocked by Experian. The reporting itself, as has been recognized by this circuit, constitutes a collection activity. I mean, in short, the pressure of a reporting constitutes a collection activity. It's not necessarily going out there and trying to execute on a rib, a task, or something. Just the reporting, the line is pursuit within the meaning of the identity theft law. Not only that, but I'll tell you, yes, Your Honor, but I'll take it also a step further. Standing up in trial, standing up in a public record, in a public forum, and calling him an identity, I'm sorry, calling him a participant in a straw purchase, calling him a criminal, that's also a pursuit. And understand that, you know, the jury eventually sided with us in this particular case, but had they sided with BMW Financial, they would have been saying, they would have been agreeing with BMW Financial that he was a criminal, that he was participating in a straw purchase. They made a public record of the fact that they were calling him a criminal. And I would call that a pursuit. I'll tell you, if that was happening to me, I would certainly call that a pursuit. So that's my statement on the identity theft claim. On the jury instruction, you know, this is the Trojan horse jury instruction. This is the first sentence of the jury instruction that they're complaining about, talks about how they want the jury to only consider the information that is received from the bureaus. All right. But this is a situation where Shantae Kim, my client, provided BMW Financial with verified police reports, handwriting examples, the whole nine yards, and basically BMW Financial is at this point whining because they did not have a jury instruction that said, oh, we're only supposed to consider the very, very brief coded information we receive from the credit bureaus, and we're allowed to basically ignore or disregard the information that is supplied directly by Shantae Kim. Judge O'Connell saw right through that instruction. And that was exactly the objection we made to that instruction. In the arguments presented to the circuit, they don't talk about the second sentence of that instruction because it tracks with the language of the Guymon case. The first sentence of that instruction is the only sentence they really cared about, because that was a sentence that was going to live or die in terms of the defense they wanted to present. But Judge O'Connell saw through it and saw that it was an improper instruction and a misstatement of the law under the Gorman case, because Gorman says it has to be a reasonable investigation based upon the available information and that the scope of the information from the credit bureaus themselves does not, quote, unquote, cabin the scope of the investigation. In short, in this specific instance, Shantae Kim stepped up and provided abundant additional information to BMW Financial with which it could have made the correct decision, and it failed. It tried to ignore that information. It tried to throw up a trial and say, basically, we only have to look at the short little coded information we got from Equifax or Experian, and that, quote, unquote, is the only thing that we have to look at. So that instruction was completely improper, number one, 10 seconds. And number two, the instruction that was given by Judge O'Connell perfectly tracks with the language of the Fair Credit Reporting Act. I want to say one thing in closing. Go ahead, Your Honor. What? I thought you were going to say something. Go ahead. You're a talking machine. Go ahead. Okay. All right. I'm about to stop being a talking machine. He's going to sum up right now. I'm going to sum up right now. Don't preface your remarks by saying, well, to be honest with the court, you know. It's not a good thing to say.  Thank you, Your Honor. Thank you. You should have learned that a long time ago. I just started practicing law. What do you know? Ms. Strickland got up here a whole bunch of times and said she had a phrase which she repeated repeatedly, out of thin air, out of thin air, out of thin air. All I heard when I was sitting over here was how my whole case was out of thin air. Their whole appeal is out of thin air. You have to ignore the record and ignore the fact that the jury believed Shantae Kim and ignore the excellent work which was done by Judge O'Connell in this case to even begin to entertain the arguments that are presented by BMW Financial. Thanks very much. Thank you, Counsel. Thanks for finishing. Your Honor, I'm going to try not to be a talking machine, but I have very little time, so I'm going to talk very quickly. First of all, I just have to at least say that the record is being mischaracterized in some pretty severe ways here. It doesn't matter because you're looking at the record. Right. You have the record. Exactly. There is absolutely no evidence in the record as to whether BMW even reported this at all, and there's certainly no evidence that BMW went around saying that the plaintiff is a criminal. That's just silly. With respect to out of thin air, that actually is a standard articulated by this circuit in the Skydive case, hence the meaning of that. With respect to the Boris case, there are very, very few cases that are right on point. Boris happens to be one of them, and the court's language is quite clear there, and in that case there were two denials of requests for insurance. The court reduced a jury award for reputational and creditworthy damages down to $25,000. Highly on point in a universe of which there are very few cases, and notably since we are accused of finding some remote case in the world of which there are many, plaintiff has not come up with other cases. Let me speak a little bit, very little bit, about the civil penalty. Pursue means pursue. The Sady case is clear. We all understand that the legislature is charged with picking language that has a precise meaning, and I always enjoy looking at the dictionary when there aren't cases that actually say what the meaning is under a particular statute. Black's Law Dictionary, 2014 edition, defines pursue to follow persistently in order to seize or obtain. That is not the situation. Even if there were reporting, that is not pursue. Was there any point in time where BMW Financial looked at Mr. Kim's records and saw that perhaps they were wrong? I don't know the answer to that question. There's certainly no evidence of that, and I think they went to trial believing they continued to be right. We came in as appellate counsel. I reviewed the evidence, and I will say with all respect to Judge Pragerson's view, I don't think the evidence is clear that this was anything other than a straw man purchase. So that's still your position? Well, we're not disputing. Despite the jury view. That is our position, but we're not arguing that. I mean, we have not taken that position on appeal because we're deferring to the jury in terms of their finding, but we don't agree with that finding, and there was much more than a cursory examination here. There was a call to the dealer. There was a review of records. This wasn't a let's just look at the trade line and the coding situation. Those situations exist. That is not this situation. And with respect to Mr. Tartar's testimony, it was mischaracterized in the argument. Mr. Tartar was very equivocal. He talked about what would happen. Well, I don't think it was mischaracterized in the argument. I read what Judge O'Neill said and Judge O'Connell said in her order, and she cites to record citations for exactly what counsel said. I was reading along exactly as he said it. But Mr. Tartar said there could be this kind of damage. He didn't tie that potential type of damage to this plaintiff. That is really the issue. With respect to the last point in the jury instruction, there clearly was jury confusion, and the absence of the Gorman instruction illustrates that. The jury came to three potentially inconsistent findings. The jury found that there were reasonable procedures in place at BMW under the CCRAA. The jury then concluded that there was a failure to diligently investigate and no reasonable investigation and came to different damages conclusions on these various causes of action, which suggests that the jury would have benefited from an instruction as to what actually constitutes reasonableness under the FCRA consistent with the direction of the Ninth Circuit in the Gorman case, which I note that this court said, we want to emphasize that you can have a reasonable investigation even if the outcome is inaccurate. And that's a really critical point here, and the jury would have benefited and the outcome might have been very different had the jury understood that in evaluating the FCRA claim. All right. Thank you, counsel. Thank you, Your Honor. Kim v. BMW Financial Services is submitted. Thank you. And we'll take up Beverly Hills Unified School District v. the Federal Transit Administration.
judges: Pregerson, Wardlaw, Chen